CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

DEC 18 2024

LAURA A. AUSTIN, CLERK
BY: s/ H. MCDONALD
    DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION**

| | |
|---|---|
| KAREN MARIE FOSTER, | **Case No.:**   4:24-cv-00051 |
| Plaintiff, | |
| v. | |
| DIGITAL SAFETY PRODUCTS, LLC, | |
| Defendant. | |

## COMPLAINT

Karen Marie Foster ("Plaintiff") by and through her counsel brings the following Complaint against Digital Safety Products, LLC ("Defendant") for violations of the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.*, arising out of an employment background check report that Defendant published to Plaintiff's potential employer, which falsely portrayed Plaintiff as a convicted felon and a convicted misdemeanant, in addition to being charged with numerous other offenses.

## INTRODUCTION

1.     This is an individual action for damages, costs, and attorney's fees brought against Defendant pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.* ("FCRA").

2.     Defendant is a consumer reporting agency that compiles and/or maintains consumer information files on consumers on a nationwide basis.

3.     Upon information and belief, Defendant sells consumer reports generated from its database and furnishes these consumer reports to Users who use the reports to make employment and other decisions.

1

4.      Defendant purposefully reaches into Virginia to (i) obtain Virginia criminal public records from Virginia, websites maintained by Virginia, or third parties that collect and sell Virginia criminal public record information; (ii) purposely avails itself of Virginia customers by selling criminal public record information to its customers located in Virginia; (iii) causes foreseeable injuries to consumers in Virginia when it publishes criminal public record information about Virginians; (iv) took these actions with respect to the Plaintiff.

5.      Defendant sold a report to a third party, which report was ultimately used by Plaintiff's employer, that falsely reported that Plaintiff was convicted of at least the following felonies: (i) Obtaining Money by False Pretenses; and (ii) four counts of Embezzlement.

6.      Defendant further reported to a third party, which report was ultimately used by Plaintiff's employer, that Plaintiff was convicted of at least the following misdemeanors: (i) False Report to Law Enforcement; (2) two counts of Illegal Dumping; (iii) three counts of False Report/Summon to Law Enforcement; (iv) two counts of Petit Larceny Check; (v) Worthless Check; and (vi) Failure to Appear.

7.      Plaintiff has never been charged with or convicted of a felony in her life.

8.      Plaintiff's employer terminated Plaintiff's employment after receiving the consumer report published by Defendant, which included the inaccurate misdemeanor and felony convictions, in addition to numerous other charges and offenses which do not belong to Plaintiff.

9.      Defendant's inaccurate reporting could have easily been avoided had Defendant reviewed the widely available public court records from Lynchburg City, Campbell County, Madison County, and Halifax County, in the Commonwealth of Virginia, regarding the felony and misdemeanor convictions, in addition to the numerous other charges and offenses, prior to

publishing Plaintiff's report to an unauthorized third party which ultimately presented same to her employer.

10.     Had Defendant performed even a cursory review of the public court records, it would have discovered that the criminal records belong to a different consumer who is wholly distinguishable from Plaintiff by at least date of birth, social security, and address information.

11.     The Commonwealth of Virginia's public websites that make criminal public records available to the public prominently disclaims the accuracy of the electronically-available information and instructs users that the only source of accurate information are the court records maintained by the individual originating courts.

12.     The Office of the Executive Secretary of the Supreme Court of Virginia also provides such records under contracts with consumer reporting agencies such as Defendant.

13.     The contract specifically disclaims the accuracy of the electronically-available information and instructs users that the only source of accurate information are the court records maintained by the individual originating courts.

14.     Defendant does not follow reasonable procedures to assure the maximum possible accuracy of the information it reports regarding consumers. Defendant's failure to employ reasonable procedures resulted in Plaintiff's report being grossly inaccurate.

15.     Defendant committed these violations pursuant to its standard policies and practices, which harm innocent consumers in their employment by prejudicing their employers with inaccurate and derogatory criminal record information.

16.     Defendant's inaccurate report cost Plaintiff a well-paying job and job security.

17.    In addition to the loss of employment, Defendant's inaccurate report caused further extensive harm to Plaintiff's personal and financial wellbeing. Specifically, the report led to the termination of her relationship with her significant other, who, upon viewing the report, also canceled a planned joint business venture with Plaintiff. This not only severed a personal relationship but also deprived Plaintiff of a significant financial opportunity and long-term economic security tied to this venture. The compounded impact of Defendant's negligent reporting practices has thus inflicted both immediate and future economic losses on Plaintiff, as well as enduring emotional distress.

18.    Plaintiff enjoyed a good reputation at her job.

19.    After Defendant's false consumer report about the Plaintiff was shared with her fellow employees, she was shunned and treated like an untrustworthy person.

20.    As a result of Defendant's publication of the false consumer report, Plaintiff has suffered a range of injuries resulting in actual damages including, without limitation, loss of employment opportunities, wages, and benefits; loss of economic opportunities and positions and advancements in the future; loss of time and money trying to correct her background check report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to her reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

21.    As a result of Defendant's conduct, action, and inaction, Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure maximum possible accuracy based on 15 U.S.C. § 1681e(b) of the FCRA, and for failing to conduct a reasonable

reinvestigation to determine whether the information Plaintiff disputed – **the criminal records that do not belong to her** – was inaccurate and delete the disputed information from the subject consumer report, in violation of the FCRA, 15 U.S.C. § 1681i.

22.    Plaintiff further brings a Section 1681b(a) claims against Defendant which dictates that a CRA may only release a consumer report to a person "which it has reason to believe...intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished..." 15 U.S.C. § 1681b(a). When a credit transaction is not initiated by the consumer, a CRA may only release the consumer's report with the consumer's authorization or if the user is making a firm offer of credit.  15 U.S.C. § 1681b(c). No consumer reporting agency may furnish a consumer report to any person if it has reasonable grounds for believing that the consumer report will not be used for a permissible purpose.  15 U.S.C. § 1681e(a).

23.    Plaintiff also alleges claims under Virginia law for defamation per se.

24.    Since Defendant had no permissible purpose to furnish this inaccurate consumer report and received no authorization from Plaintiff allowing for the release of the consumer report with the inaccurate criminal records contained therein (pursuant to 15 U.S.C. § 1681b(a)), Defendant violated the permissible purpose requirement set forth in 15 U.S.C. § 1681b(a).

## PARTIES

25.    Karen Marie Foster ("Plaintiff" or) is a natural person residing in South Boston, Virginia, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

26.    Defendant Digital Safety Products, LLC ("Defendant") is a California corporation doing business throughout the United States, including the Commonwealth of Virginia and in this District, and has a principal place of business located at 1804 Garnet Ave., Suite 409, San Diego,

5

CA 92109. Defendant can be served through its registered agent, California Corporate Agents, Inc., located at 2108 N St., Ste. C, Sacramento, CA 95816.

27.    Among other things, Defendant operates a website www.Spyfly.com that sells "comprehensive background checks," a type of consumer report, to third parties, which Defendant knows will be used by third parties including employers, for their use in deciding whether to take adverse action such as termination, failure to hire, or failure to promote, as was done in the case at hand.  These reports are provided in connection with a business transaction initiated by third parties.

28.    Defendant regularly engages in whole or in part in the practice of assembling or evaluating consumer information for the purpose of furnishing consumer reports to third parties.

29.    Here, Defendant was hired to search for, collect, and report records about Plaintiff's background, focusing on criminal records.

30.    Such criminal record information is legally considered "credit information" under relevant case law, since it bears upon consumer's credit worthiness, credit standing, credit capacity, character, general reputation, and personal characteristics.

31.    It is already well-established that "credit information" which is the information that bears upon a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living, such as a criminal record report that is transmitted satisfies the definition of a consumer report.

32.    Defendant's gathered and assess this data about the Plaintiff, then compiled and delivered a report to an unauthorized third-party, who eventually presented this report to Plaintiff's employer, Morningstar's Bed, Bath and Curtain ("Morningstar").

33.    By providing this service of gathering, compiling, and reporting false criminal public records information about the Plaintiff to a third party, Defendant communicated and published sensitive credit information about Plaintiff, for profit, to an unauthorized third-party user and Plaintiff's employer—who was the ultimate user of this information.

34.    Defendant's report further states, "SpyFly provides ***affordable***, and immediate access to public record information." The use of the term affordable demonstrates that Defendant charges for its services in supplying such consumer information that bears upon consumer's credit worthiness, credit standing, credit capacity, character, general reputation, and personal characteristics, to third parties.

35.    Defendant's regular practice of issuing consumer reports is evident in its own language. The report explicitly states: "PDF report on Karen Marie Foster of South Boston, VA. As with all SpyFly people reports..."

36.    This phrasing, particularly "all SpyFly people reports," clearly indicates that producing such consumer reports about people is a standard, recurring, and defining aspect of Defendant's business operations.

37.    As such, Defendant is a consumer reporting agency as defined in 15 U.S.C. § 1681a(f) because for monetary fees, it regularly engages in the practice of evaluating and/or assembling information on consumers for the purpose of furnishing consumer reports to third parties, and uses interstate commerce, including the Internet, for the purpose of preparing and furnishing such consumer reports.

38.     Defendant knew that the criminal public record information it communicates about consumers is used or expected to be used or collected in whole or in part for any one of several purposes, including employment purposes.

39.     Defendant did communicate criminal record information which demonstrably bears upon Plaintiff's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living, such as a criminal record report that is transmitted satisfies the definition of a consumer report.

40.     Specifically, criminal records indicate character traits such as dishonesty, untrustworthiness, and lack of financial integrity, and indicate a mode of living such as risk-taking, instability, and disregard for the law and social norms.

41.     The inaccurate criminal record information that Defendant compiled and furnished was ultimately utilized for an employment related purpose, which ended in the termination of her employment at Morningstar's, Bed, Bath and Curtain ("Morningstar") solely due to the incorrect information that was contained in Defendant's background check report it had produced, which was presented to Morningstar on May 8, 2024. This therefore meets the requirement of being used for the purpose of serving as a factor in establishing the consumer's eligibility for employment purposes as it was the only factor that led to her abrupt and immediate termination. *Randall v. Taylor*, 2020 U.S. Dist. LEXIS 190280, *13-*14 (M.D. Tenn. Aug. 17, 2020) (citing 15 U.S.C. § 1681a(h); *see also Johnson v. Sherwin-Williams Co.*, 152 F. Supp. 3d 1021, 1025 (N.D. Ohio 2015)).

42.     Beyond the actual use of this consumer report that Defendant produced about Plaintiff, for a Section 1681b(a) purpose, Defendant could also have expected the report to be used

or collected it in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for some authorized purpose pursuant to Section 15 USCS § 1681b(a), for the report in question to constitute a consumer report.

43.    The purpose for which the report was or could be expected to be used is established by showing intent, including an inference from the foreseeable and logical consequences of a course of conduct. *Henderson v. Corelogic Nat'l Background Data, LLC*, 178 F. Supp. 3d 320, 338, n. 7 (E.D. Va. 2016) ("a permissible purpose will be attributed to a CRA so long as that CRA had 'reason to believe' that it was providing reports only for that purpose").

44.    Defendant reasonably foresaw the logical consequences that its report would be used to evaluate consumers' eligibility for employment or other authorized purposes under Section 15 U.S.C. § 1681b, given the nature of its business and the data it compiled.

45.    Defendant should have foreseen that derogatory criminal record information, especially involving allegations of felonies and repeated misdemeanors, would likely disseminate to parties in a position to affect Plaintiff's employment and reputation, particularly employers. Consumers, like Plaintiff, whose work requires high trust, are uniquely vulnerable to the dissemination of such damaging information, which can profoundly impact their professional relationships and standing.

46.    Given Defendant's role as a disseminator of such criminal record information, it is reasonably foreseeable that a report including severe criminal charges would circulate to Plaintiff's employer or others evaluating her suitability for employment. Employers, especially those in fields requiring reliable, responsible individuals, would encounter such reports upon their publication and would very likely review such reports with a high level of scrutiny. When presented with

information indicating serious criminal history, employers would logically respond with distrust, concern, and suspicion, potentially viewing the consumer as untrustworthy, unfit, or unsafe to continue in their role. Defendant's report, therefore, had an inherent risk of influencing employers' perceptions, making the consumer vulnerable to negative evaluations, adverse employment actions, and in Plaintiff's case, abrupt termination.

47.     The Defendant attempts to avoid its obligation to comply with the strictures of the FCRA merely by disclaiming FCRA governance.

48.     The Defendant publishes a warning to its customers that the information should not be used for an FCRA-governed purpose.

49.     Upon information and belief, the Defendant does nothing to learn the purpose of any consumer information that it sells to its customers.

50.     Upon information and belief, the Defendant does nothing to ensure that its customers are educated about the FCRA.

51.     Upon information and belief, the Defendant does nothing to ensure that its customers do not intend to use or do not use the consumer information it sells for an employment or other FCRA-governed purpose.

52.     Furthermore, Defendant should have been aware that its customers, including ultimate users such as employers, utilize consumer information to assess an employee's ongoing suitability, integrity, and risk, which makes the inclusion of unverified, damaging, false criminal public record information even more concerning.

53.     The foreseeable, logical outcome of providing unverified derogatory criminal records in Plaintiff's report to unknown, unvetted, third parties was that her employer would

ultimately be presented with the report (especially where the report portrays such a serious criminal) and rely on this information to make determinations about her employment, as employers reasonably rely on such consumer reports depicting such egregious crimes to assess character and trustworthiness.

54.     This predictable outcome confirms that Defendant expected, or at the very least should have expected, that such grossly stigmatizing criminal records would ultimately be used for a permissible purpose under Section 1681b(a), given that employers and others regularly rely on such information to evaluate a consumer's eligibility for continued employment and other critical opportunities.

55.     The consumer information about Plaintiff that was communicated by Defendant therefore constitutes a consumer report pursuant to 15 U.S.C. § 1681a(d).

## JURISDICTION AND VENUE

56.     This Court has federal question jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

57.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a).

58.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## STATUTORY BACKGROUND

59.     Enacted in 1970, the FCRA's passage was driven in part by two related concerns: first, that consumer reports were playing a central role in people's lives at crucial moments, such

as when they applied for a job or credit, and when they applied for housing.  Second, despite their importance, consumer reports were unregulated and had widespread errors and inaccuracies.

60.    While recognizing that consumer reports play an important role in the economy, Congress wanted consumer reports to be "fair and equitable to the consumer" and to ensure "the confidentiality, accuracy, relevancy, and proper utilization" of consumer reports.  15 U.S.C. § 1681.

61.    Congress, concerned about inaccuracies in consumer reports, specifically required consumer reporting agencies to follow "reasonable procedures to assure maximum possible accuracy" in consumer reports. 15 U.S.C. § 1681e(b).

62.    Consumer reports that contain factually incorrect information which does not belong to the consumer at issue are neither maximally accurate nor fair to the consumers who are the subjects of such reports.

63.    Despite its name, the Fair Credit Reporting Act covers more than just credit reporting, it also regulates employment background check reports like the one Defendant prepared in Plaintiff's name.

64.    The FCRA provides a number of protections for job applicants who are the subject of background checks for purposes of securing employment, housing, and other purposes.

65.    In the parlance of the FCRA, background checks are "consumer reports," and providers of background checks, like Defendant, are "consumer reporting agencies."  15 U.S.C. §§ 1681a(d) and (f).

66.    The FCRA imposes duties on consumer reporting agencies to assure that consumer reports are accurate and that "consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681.

67.    Under 15 U.S.C. § 1681e(b), consumer reporting agencies are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

68.    Defendant disregarded its duties under the FCRA with respect to Plaintiff's background check report.

### DEFENDANT'S ILLEGAL BUSINESS PRACTICES

69.    Over the past 15 years, there has been increased collection and aggregation of consumer data, including criminal records and sex offender registration data.  As a result of the increasing availability of this data, there has been a boom in the background check industry.

70.    Background checks generally contain criminal public record information and are consumer reports.

71.    As summarized in a report by the Consumer Financial Protection Bureau, a 2018 survey of employers found that 95 percent of employers surveyed conducted one or more types of background screening.

72.    The criminal background check industry takes in revenues in excess of three billion dollars, annually.

73.    Criminal background checks are generally created by running automated searches through giant databases of aggregated criminal record data.  The reports are created and disseminated with little to no manual, in-person review, and the court records are rarely directly reviewed in creating criminal background checks.

74.    Background check companies are consumer reporting agencies, like Defendant, that collect millions of criminal records from a number of sources with data from county, state,

and federal level sources.  The data included on the reports is often not obtained directly from court records on an individual basis but instead is purchased in bulk or scraped from court websites.

75.    Given that Defendant is in the business of selling criminal public record information, Defendant should be well aware of the FCRA and the attendant harm to consumers for reporting inaccurate or outdated information.

76.    Defendant places its business interests above the rights of consumers and reports such inaccurate information because it is cheaper for Defendant to produce reports containing information that is inaccurate and incomplete than it is for Defendant to exert proper quality control over the reports prior to their being provided to Defendant's customers.

77.    Defendant has further attempted to skirt its FCRA obligations by use of a simple disclaimer and purposely establishing a business practice whereby it chooses to know nothing about the third party to whom it sells criminal public records in its reports.

78.    Defendant chooses to not obtain information about the intended use of the criminal public record information it sells in its reports.

79.    Defendant chooses to not obtain information about users of the criminal public record information it sells in its reports.

80.    Defendant reports such erroneous and incomplete information because it wants to maximize the automation of its report creation process, thereby saving the costs associated with conducting the additional review necessary to remove the inaccurate or out-of-date entries.

81.    Defendant charges its customers the same price for reports that are grossly inaccurate as it does for accurate reports.

82.     Appropriate quality control review of Plaintiff's report would have made clear that Defendant was reporting misdemeanor and felony convictions that belong to an unrelated consumer who, at the very least, had a different date of birth, and/or, a different social security number, and/or different address information than Plaintiff.

83.     As a provider of criminal public record information in its reports, Defendant should be aware of the FCRA requirements and should be a member of the Professional Background Screening Association ("PBSA"). PBSA hosts a conference at least once a year where presenters discuss compliance with federal and state consumer reporting laws.

## FACTS
### Plaintiff's Employment with Morningstar

84.     Plaintiff has been a long-standing employee of Morningstar—a successful bed and linen store, with a record of significant accomplishments within the company.

85.     Specifically, Plaintiff undertook her employment in Morningstar in May 2022, and was tasked with handling the company's social media presence, in addition to some office work.

86.     As Plaintiff's tenure with the company progressed, Plaintiff was entrusted with additional responsibilities, which she executed with excellence, ultimately earning her the trust and confidence of her superior. This level of performance led to advanced discussions with her supervisor about jointly opening a new business venture.

87.     These additional responsibilities that Plaintiff was afforded because of her evolution in the business included managing store orders and shipments, and understanding inventory prices.

### Defendant Published an Inaccurate Background Check Report about Plaintiff

15

88.    A third party engaged Defendant to conduct a criminal public records search about the Plaintiff, without knowledge or authorization of the Plaintiff.

89.    The Defendant sells subscriptions to its "comprehensive background check" services.

90.    Despite the fact that the subscription service contains a terms of use that attempts to disclaim its status as a consumer reporting agency for FCRA purposes, Defendant does nothing to ensure that the users to whom it sells consumer reports will not use them for such FCRA-governed purposes.

91.    Specifically, on or about May 8, 2024, this unauthorized third-party ordered a criminal public records report on Plaintiff from Defendant.

92.    On or about May 8, 2024, in accordance with its standard procedures, Defendant completed its report about Plaintiff, sold, and delivered it to the unauthorized third party.

93.    Within that consumer report, Defendant published inaccurate criminal conviction information about Plaintiff.

94.    Specifically, Defendant's consumer report about Plaintiff included the following misdemeanor charges and convictions: (i) two counts of Arraigned communicating threat; (ii) two counts of arraigned second degree trespass; (iii) violate suspended sentence; (iv) four counts of false reporting to law enforcement; (v) two counts of illegal dumping; (vi) two counts of petit larceny check; (vii) worthless check; and (viii) two counts of failure to appear.



| 2010 | ARRAIGNED:COMMUNICATING THREAT | Case Number | 01580MADISON 2010CR 050306 |
| | | Case Type | MISDEMEANOR |
| | | Crime Type | MISDEMEANOR |
| | | Crime County | MADISON |
| | | Offense Code | 14-277.1 |
| | | Offense Date | 04/12/2010 |
| | | Offense Description | ARRAIGNED:COMMUNICATING THREATS |
| | | Charges Filed Date | 04/12/2010 |
| | | Court | MADISON |
| | | Disposition | DISMISSAL WITHOUT LEAVE BY DA |
| | | Disposition Date | 08/31/2010 |
| | | Source State | NC |
| | | Date of Birth: | ████ 956 |
| | | Subject's Address: | 2732 RIDGEWOOD DR, LYNCHBURG, VA 2450 3-2934 |
| 2010 | ARRAIGNED:SECOND DEGREE TRESPA... | Case Number | 01580MADISON 2010CR 050306 |
| | | Case Type | MISDEMEANOR |
| | | Crime Type | MISDEMEANOR |
| | | Crime County | MADISON |

|  |  |
|---|---|
|  | 3-2934 |

| 2010  ARRAIGNED COMMUNICATING THREAT... | Case Number | 01580MADISON 2010CR 050308 |
|---|---|---|
| | Case Type | MISDEMEANOR |
| | Crime Type | MISDEMEANOR |
| | Crime County | MADISON |
| | Offense Code | 14-277 1 |
| | Offense Date | 04/12/2010 |
| | Offense Description | ARRAIGNED COMMUNICATING THREATS |
| | Charges Filed Date | 04/12/2010 |
| | Court | MADISON |
| | Disposition | DISMISSAL WITHOUT LEAVE BY DA |
| | Disposition Date | 08/31/2010 |
| | Source State | NC |
| | Date of Birth: | ████ 1958 |
| | Subject's Address: | 2232 RIDGEWOOD DR, LYNCHBURG, VA 2450 3-2934 |

| 2010  ARRAIGNED SECOND DEGREE TRESPA... | Case Number | 01580MADISON 2010CR 050305 |
|---|---|---|
| | Case Type | MISDEMEANOR |
| | Crime Type | MISDEMEANOR |
| | Crime County | MADISON |
| | Offense Code | 14-159 13 |
| | Offense Date | 04/12/2010 |
| | Offense Description | ARRAIGNED SECOND DEGREE TRESPASS |
| | Charges Filed Date | 04/12/2010 |
| | Court | MADISON |
| | Disposition | DISMISSAL WITHOUT LEAVE BY DA |
| | Disposition Date | 08/31/2010 |
| | Source State | NC |
| | Date of Birth: | ████ 956 |
| | Subject's Address: | 2232 RIDGEWOOD DR, LYNCHBURG, VA 2450 3-2934 |

| 2012 VIOLATE SUSPENDED SENTENCE | Case Number | CR10021330-03 |
|---|---|---|
| | Classification | MISDEMEANOR |
| | Crime Type | MISDEMEANOR |
| | Offense Code | 19.2-306 |
| | Offense Date | 09/24/2012 |
| | Offense Description | VIOLATE SUSPENDED SENTENCE |
| | Charges Filed Date | 09/24/2012 |
| | Court | CIRCUIT |
| | Disposition | DISMISSED |
| | Disposition Date | 03/08/2013 |
| | Extra Info | CaseComments=COMMENCED BY: REINSTATEMENT |
| | Source State | VA |
| | Subject's Address: | LYNCHBURG, VA 24503 |

| 2010 FALSE REPORT TO LAW ENFORCEMEN... | Arrest Date | 11/09/2008 |
|---|---|---|
| | Case Number | CR10021330-00 |
| | Classification | MISDEMEANOR |
| | Crime Type | MISDEMEANOR |
| | Offense Code | 18.2-461 |
| | Offense Date | 11/13/2008 |
| | Offense Description | FALSE REPORT TO LAW ENFORCEMEN |
| | Charges Filed Date | 02/16/2010 |
| | Court | CIRCUIT |
| | Plea | NOT GUILTY |
| | Disposition | GUILTY |
| | Disposition Date | 11/10/2010 |
| | Court Costs | $2344.80 |
| | Fines | $1500.00 |
| | Extra Info | CaseComments=COMMENCED BY: GENERAL DISTRICT COURT APPEAL |
| | Source State | VA |
| | Subject's Address: | LYNCHBURG, VA 24503 |

| 2005 ILLEGAL DUMPING | Case Number | CR05007865-00 |
|---|---|---|
| | Classification | MISDEMEANOR |

| 2005 ILLEGAL DUMPING | Case Number | CR05007865-00 |
|---|---|---|
| | Classification | MISDEMEANOR |
| | Crime Type | MISDEMEANOR |
| | Offense Code | 62.1-194.1 |
| | Offense Date | 02/03/2005 |
| | Offense Description | ILLEGAL DUMPING |
| | Charges Filed Date | 12/22/2005 |
| | Court | CIRCUIT |
| | Plea | NOT GUILTY |
| | Disposition | GUILTY |
| | Disposition Date | 07/06/2006 |
| | Sentence | SentenceAdditionalInfo=SUSPENDED SENTENCE, 0 YEAR(S)12 MONTH(S)0 DAY(S)jSentenceMaxMonths=12 |
| | Court Costs | $136.00 |
| | Extra Info | CaseComments=COMMENCED BY: GENERAL DISTRICT COURT APPEAL |
| | Source State | VA |
| | Subject's Address: | LYNCHBURG, VA 24503 |

| 2009 | FALSE REPORT/SUMMON TO LAW ENF | Case Number | 680GC09018326-00 |
|------|--------------------------------|-------------|------------------|
| | | Classification | MISDEMEANOR |
| | | Counts | 1 |
| | | Crime Type | MISDEMEANOR |
| | | Offense Code | 18.2-461 |

| | Offense Date | 11/13/2008 |
|--|--------------|------------|
| | Offense Description | FALSE REPORT/SUMMON TO LAW ENF |
| | Charges Filed Date | 11/10/2009 |
| | Court | LYNCHBURG GENERAL DISTRICT |
| | Disposition | GUILTY |
| | Source State | VA |
| | Subject's Address: | SOUTH BOSTON, VA 24592 |

| | Extra Info | CaseComments=[DEFENDANTSTATUS] RELEASED ON SUMMONS; [OFFICER]BOWEN, OFFICER |
|--|------------|------|
| | Source State | VA |
| | Subject's Address: | SOUTH BOSTON, VA 24592 |
| | Case Number | 680GC09018326-00 |
| | Classification | MISDEMEANOR |
| | Counts | 1 |
| | Crime Type | MISDEMEANOR |
| | Offense Code | 18.2-461 |

**10 of 25**

LAW ENF

| | Offense Date | 11/13/2008 |
|--|--------------|------------|
| | Offense Description | FALSE REPORT/SUMMON TO LAW ENF |
| | Charges Filed Date | 11/10/2009 |
| | Court | LYNCHBURG GENERAL DISTRICT |
| | Disposition | GUILTY |
| | Source State | VA |
| | Subject's Address: | SOUTH BOSTON, VA 24592 |

| 2010 | FALSE REPORT TO LAW ENFORCEMEN... | Case Number | 680CR10021330-00F OSKAR |
|------|-----------------------------------|-------------|------------------------|
| | | Case Type | MISDEMEANOR |
| | | Crime Type | MISDEMEANOR |
| | | Crime County | LYNCHBURG CITY |
| | | Offense Code | 18.2-461 |
| | | Offense Date | 11/13/2008 |
| | | Offense Description | FALSE REPORT TO LAW ENFORCEMEN |
| | | Charges Filed Date | 02/18/2010 |
| | | Court | LYNCHBURG CIRCUIT - CRIMINAL DIVISION |
| | | Disposition | GUILTY |
| | | Disposition Date | 11/10/2010 |
| | | Court Costs | 301.00 |
| | | Fines | 150 |
| | | Source State | VA |
| | | Subject's Address: | LYNCHBURG, VA 24503 |

| 1995  PETIT LARCENY CHECK | Case Number | 680CR9500680400 |
|---|---|---|
| | Case Type | MISDEMEANOR |
| | Crime Type | MISDEMEANOR |
| | Crime County | LYNCHBURG CITY |
| | Offense Code | 18.2-181 |
| | Offense Date | 11/28/1994 |
| | Offense Description | PETIT LARCENY CHECK |
| | Charges Filed Date | 04/11/1995 |
| | Court | LYNCHBURG CIRCUIT |
| | Disposition | NOLLE PROSEQUI |
| | Disposition Date | 05/22/1995 |
| | Source State | VA |
| | Date of Birth: | ████1956 |

| 1995  WORTHLESS CHECK | Case Number | 680GC9500150800 |
|---|---|---|
| | Case Type | MISDEMEANOR |
| | Crime Type | MISDEMEANOR |
| | Crime County | LYNCHBURG CITY |
| | Offense Date | 11/28/1994 |
| | Offense Description | WORTHLESS CHECK |
| | Charges Filed Date | 01/31/1995 |
| | Court | LYNCHBURG GD |
| | Disposition | - GUILTY |
| | Disposition Date | 03/28/1995 |
| | Source State | VA |
| | Date of Birth: | 03/11/1956 |

| 1995  FAIL TO APPEAR | Arrest Date | 01/28/1995 |
|---|---|---|
| | Case Number | 680CR9500680401 |
| | Case Type | MISDEMEANOR |
| | Classification | MISDEMEANOR |
| | Crime Type | MISDEMEANOR |
| | Crime County | LYNCHBURG CITY |
| | Offense Code | 18.2-456 |
| | Offense Date | 02/15/1995 |

| 1995  FAIL TO APPEAR | Arrest Date | 01/28/1995 |
|---|---|---|
| | Case Number | 680CR9500680401 |
| | Case Type | MISDEMEANOR |
| | Classification | MISDEMEANOR |
| | Crime Type | MISDEMEANOR |
| | Crime County | LYNCHBURG CITY |
| | Offense Code | 18.2-456 |
| | Offense Date | 02/15/1995 |
| | Offense Description | FAIL TO APPEAR |
| | Charges Filed Date | 04/11/1995 |
| | Court | LYNCHBURG CIRCUIT |
| | Plea | NOT GUILTY |
| | Disposition | DISMISSED |
| | Disposition Date | 05/22/1995 |
| | Extra Info | CaseComments=COMMENCED BY: GENERAL DISTRICT COURT APPEAL |
| | Source State | VA |
| | Date of Birth: | ████1956 |
| | Subject's Address: | LYNCHBURG, VA 24501 |



| 1995 | PETIT LARCENY CHECK | Arrest Date | 01/28/1995 |
|---|---|---|---|
| | | Case Number | CR95008804-00 |
| | | Classification | MISDEMEANOR |
| | | Crime Type | MISDEMEANOR |
| | | Offense Code | 18.2-181 |
| | | Offense Date | 11/28/1994 |
| | | Offense Description | PETIT LARCENY CHECK |
| | | Charges Filed Date | 04/11/1995 |
| | | Court | CIRCUIT |
| | | Disposition | NOLLE PROSEQUI |
| | | Disposition Date | 05/22/1995 |
| | | Extra Info | CaseComments=COMMENCED BY GENERAL DISTRICT COURT APPEAL |
| | | Source State | VA |
| | | Date of Birth: | ████ 1956 |
| | | Subject's Address: | LYNCHBURG, VA 24501 |

95.    Defendant additionally reported the following felony charges and convictions: (i) two counts of obtain money by false pretense; and (ii) four counts of embezzlement;

| 2001 | OBTAIN MONEY BY FALSE PRETENSE ... | Case Number | 031GC0100583600 |
|---|---|---|---|
| | | Case Type | FELONY |
| | | Crime Type | FELONY |
| | | Crime County | CAMPBELL |
| | | Offense Code | 18.2-178 |
| | | Offense Date | 12/26/1996 |
| | | Offense Description | OBTAIN MONEY BY FALSE PRETENSE |
| | | Charges Filed Date | 08/28/2001 |
| | | Court | CAMPBELL GD |
| | | Disposition | DISMISSED |
| | | Disposition Date | 08/30/2002 |
| | | Source State | VA |
| | | Date of Birth: | ████ 1956 |
| 2001 | EMBEZZLEMENT | Case Number | 031GC0100650300 |
| | | Case Type | FELONY |
| | | Crime Type | FELONY |
| | | Crime County | CAMPBELL |
| | | Offense Code | 18.2-111 |



| | |
|---|---|
| Case Number | 031GC0100583600 |
| Case Type | FELONY |
| Crime Type | FELONY |
| Crime County | CAMPBELL |
| Offense Code | 18.2-178 |
| Offense Date | 12/28/1998 |
| Offense Description | OBTAIN MONEY BY FALSE PRETENSE |
| Charges Filed Date | 08/28/2001 |
| Court | CAMPBELL GD |
| Disposition | DISMISSED |
| Disposition Date | 08/30/2002 |
| Source State | VA |
| Date of Birth: | ███ 1956 |

**2001 EMBEZZLEMENT**

| | |
|---|---|
| Case Number | 031GC0100650500 |
| Case Type | FELONY |
| Crime Type | FELONY |
| Crime County | CAMPBELL |
| Offense Code | 18.2-111 |
| Offense Date | 12/28/1999 |
| Offense Description | EMBEZZLEMENT |
| Charges Filed Date | 09/28/2001 |
| Court | CAMPBELL GD |
| Disposition | DISMISSED |
| Disposition Date | 08/30/2002 |
| Source State | VA |
| Date of Birth: | ███ 956 |

**1993 EMBEZZLEMENT**

| | |
|---|---|
| Case Number | 680GC9300864900 |
| Case Type | FELONY |
| Crime Type | FELONY |
| Crime County | LYNCHBURG CITY |
| Offense Date | 02/11/1956 |
| Offense Description | EMBEZZLEMENT |
| Charges Filed Date | 05/20/1993 |
| Court | LYNCHBURG GD |

| | | |
|---|---|---|
| 1993  EMBEZZLEMENT | Case Number | 880GC9300864900 |
| | Case Type | FELONY |
| | Crime Type | FELONY |
| | Crime County | LYNCHBURG CITY |
| | Offense Date | 02/11/1958 |
| | Offense Description | EMBEZZLEMENT |
| | Charges Filed Date | 05/20/1993 |
| | Court | LYNCHBURG GD |
| | Disposition | NOLLE PROSEQUI |
| | Disposition Date | 08/25/1993 |
| | Source State | VA |

96.    Defendant further reported the following inaccurate offenses, infractions, and other unspecified charges about Plaintiff: (i) two counts of unspecified charges; (ii) three counts of 54/35 speeding; (iii) two counts of 79/65 speeding; (iv) contempt/FTA; (v) expired registration; (vi) no city sticker:

| | | |
|---|---|---|
| 2018  NOT SPECIFIED | Case Number | 1002018CR 082819 |
| | Case Type | CRIMINAL |
| | Crime Type | NOT CATEGORIZED |
| | Offense Description | NOT SPECIFIED |
| | Charges Filed Date | 03/21/2018 |
| | Source State | NC |
| | Date of Birth: | 01/01/1965 |
| | Subject's Address: | 37 ABERDEEN DR, ARDEN, NC 28704-9243 |
| 2010  NOT SPECIFIED | Case Number | 5802010050308CR |
| | Case Type | CRIMINAL |
| | Crime Type | NOT CATEGORIZED |
| | Crime County | MADISON |
| | Offense Description | NOT SPECIFIED |
| | Charges Filed Date | 04/12/2010 |
| | Court | MADISON |
| | Source State | NC |
| | Date of Birth: | 03/11/1956 |
| | Subject's Address: | 2232 RIDGEWOOD DR, LYNCHBURG, VA 2450 3-2934 |

2022   54/35 SPEEDING

| | |
|---|---|
| Case Number | GT22004812-00 |
| Classification | INFRACTION CLASS U |
| Crime Type | TRAFFIC |
| Crime County | HALIFAX |
| Offense Code | G.46.2-875 |
| Offense Date | 10/12/2022 |
| Offense Description | 54/35 SPEEDING |
| Charges Filed Date | 10/19/2022 |
| Court | HALIFAX GENERAL DISTRICT COURT |
| Extra info | CaseComments={DEFENDANTSTATUS} RELEA SED ON SUMMONS; {OFFICER};BOWEN, OFFI CER |
| Source State | VA |
| Subject's Address: | SOUTH BOSTON, VA 24592 |

2006  79/65 SP

| | |
|---|---|
| Case Number | 187GT06021174-00 |
| Classification | INFRACTION |
| Crime Type | TRAFFIC |
| Crime County | WYTHE |
| Offense Code | F 46.2-870 |
| Offense Date | 09/15/2006 |
| Offense Description | 79/65 SP |
| Charges Filed Date | 09/20/2006 |
| Court | WYTHE GENERAL DISTRICT |
| Disposition | GUILTY IN ABSENTIA |



| | |
|---|---|
| Extra Info | CaseComments=[DEFENDANT STATUS]: RELEASED ON SUMMONS; [OFFICER] BOWEN, OFFICER |
| Source State | VA |
| Subject's Address: | SOUTH BOSTON, VA 24592 |

2006  79/65 SP

| | |
|---|---|
| Case Number | 187QT06021174-00 |
| Classification | INFRACTION |
| Crime Type | TRAFFIC |
| Crime County | WYTHE |
| Offense Code | F.46.2-870 |
| Offense Date | 09/15/2006 |
| Offense Description | 79/65 SP |
| Charges Filed Date | 09/20/2006 |
| Court | WYTHE GENERAL DISTRICT |
| Disposition | GUILTY IN ABSENTIA |
| Court Costs | $76.00 |
| Fines | $70.00 |
| Source State | VA |
| Subject's Address: | LYNCHBURG, VA 24501 |

1995  CONTEMPT/FTA

| | |
|---|---|
| Case Number | 680GC9500150801 |
| Case Type | SHOW CASE |
| Crime Type | NOT CATEGORIZED |
| Crime County | LYNCHBURG CITY |
| Offense Date | 02/15/1995 |
| Offense Description | CONTEMPT/FTA |
| Charges Filed Date | 02/17/1995 |
| Court | LYNCHBURG GD |
| Disposition | GUILTY |
| Disposition Date | 03/28/1995 |
| Source State | VA |
| Date of Birth: | ████1956 |
| Subject's Address: | LYNCHBURG VA 24501 |

| 1983 EXP. REGISTRATION | Case Number | 680GT9301401800 |
| | Case Type | INFRACTION |
| | Crime Type | TRAFFIC |
| | Crime County | LYNCHBURG CITY |
| | Offense Date | 08/27/1983 |
| | Offense Description | EXP. REGISTRATION |
| | Charges Filed Date | 05/31/1983 |
| | Court | LYNCHBURG GD |
| | Disposition | PREPAID |
| | Disposition Date | 08/27/1983 |
| | Fines | Y |
| | Source State | VA |

| 1994 NO CITY STICKER | Case Number | 680GT9400588900 |
| | Case Type | INFRACTION |
| | Crime Type | TRAFFIC |
| | Crime County | LYNCHBURG CITY |
| | Offense Date | 05/14/1994 |
| | Offense Description | NO CITY STICKER |
| | Charges Filed Date | 05/16/1994 |
| | Court | LYNCHBURG GD |
| | Disposition | NOT GUILTY/ACQUITTED |
| | Disposition Date | 06/15/1994 |
| | Source State | VA |

| 1994 SPEDING 54/35 | Case Number | 680GT9400588700 |
| | Case Type | INFRACTION |
| | Crime Type | TRAFFIC |
| | Crime County | LYNCHBURG CITY |
| | Offense Date | 05/14/1994 |
| | Offense Description | SPEDING 54/35 |
| | Charges Filed Date | 05/16/1994 |
| | Court | LYNCHBURG GD |
| | Disposition | PREPAID |
| | Disposition Date | 06/15/1994 |
| | Fines | Y |
| | Source State | VA |



97.     The criminal convictions reported by Defendant about Plaintiff to this unauthorized

third party *do not* belong to Plaintiff.

98.     Plaintiff has never been charged with or convicted of a felony in her life.

99.     Had Defendant actually consulted or obtained the widely available public court

records regarding these inaccurate criminal record reports, it would have seen obvious

discrepancies between Plaintiff's true criminal record and what was reported of her.

100.    The sole reason the inaccurate criminal records were reported as belonging to

Plaintiff was that Defendant failed to follow reasonable procedures to assure the maximum

possible accuracy of the information it published within the consumer report it sold about Plaintiff

to this unauthorized third party who ultimately presented this consumer report to Plaintiff's

employer.

29

101.    Had Defendant followed reasonable procedures, it would have discovered that the inaccurate, stigmatizing criminal convictions belong to unrelated individuals with at the very least different Social Security Numbers, with different address information, and/or different dates of birth.

102.    In preparing and selling a consumer report about Plaintiff, wherein Defendant published to Plaintiff's prospective employer inaccurate information about Plaintiff, Defendant failed to follow reasonable procedures to assure that the report was as accurate as maximally possible, in violation of 15 U.S.C. § 1681e(b).

### Morningstar Terminated Plaintiff's Employment

103.    On May 12, 2024, Plaintiff was notified that her employment with Morningstar was terminated due to the numerous criminal charges and convictions, including both misdemeanors and felonies, reported about her.

104.    Shortly thereafter, Plaintiff obtained a copy of the consumer report and was shocked and humiliated to find entirely inaccurate criminal charges, convictions, infractions, and offenses published in it. Defendant had sold this report to an unauthorized third party, who then presented it to Plaintiff's employer, resulting in her termination.

105.    As a further consequence, the planned business venture between Plaintiff and her supervisor was foreclosed. The trust essential to this partnership was damaged, resulting in the abrupt termination of their joint endeavor.

106.    The fallout extended beyond her professional life, causing profound strains on Plaintiff's personal relationships by leading to the end of her relationship with her significant other.

107.    This information even spread to Plaintiff's church, where her pastor became aware of the reported criminal record.

108.    Plaintiff contacted Morningstar and informed them that these criminal records are flagrant and reckless inaccuracies, as she has never been charged with or convicted of any of the aforementioned crimes.

109.    Plaintiff was very panicked, confused, and concerned about the impact of these serious criminal convictions reported on the subject consumer report – specifically, the impact of the same on her future.

110.    More precisely, Plaintiff is employed in a sensitive role with the court as a process server, where she is responsible for serving legal documents—a position that requires a spotless criminal record, as individuals with criminal histories are prohibited from holding such roles. Upon discovering the flagrant inaccuracies in Defendant's report, Plaintiff was overcome with panic, acutely aware that these errors could jeopardize her employment and her ability to work with the court.

111.    Plaintiff was further panicked because she holds gun licenses in two states and a real estate license all of which can be lost by the publication of this grossly inaccurate and derogatory criminal record information.

112.    Specifically, Defendant published the false and derogatory criminal records onto the consumer report about Plaintiff and sold that report to an unauthorized third party who in turn presented this consumer report to Plaintiff's employer.

113.    On May 13, 2024, Plaintiff went to the local courthouse and obtained a copy of her background check that had been run by the local Sheriff's Office in January 2023, which reflected that Plaintiff had no reported criminal records.

114.    Plaintiff's complete lack of any criminal records is further evident from the fact that she successfully transferred her gun licenses to Virginia, obtained employment serving court documents, and continues to maintain her real estate license, none of which could presumably be possible (especially the maintenance and transfer of Plaintiff's gun licenses) unless Plaintiff maintained a spotless criminal record.

115.    As such, this exculpatory public record information was widely available to Defendant prior to publishing Plaintiff's consumer report which was presented to Morningstar, but Defendant failed to perform even a cursory review of such information.

**Plaintiff Disputed the Misinformation in Defendant's Consumer Report**

116.    On May 13, 2024, Plaintiff, desperate to regain her position with Morningstar, restore her joint business venture with her supervisor, salvage her personal relationship, and overwhelmed by anxiety over the profound and far-reaching consequences of being inaccurately branded as a convicted felon and misdemeanant disputed the inaccurate information with Defendant.  Plaintiff disputed via email with Defendant.

117.    Plaintiff identified herself and provided information to Defendant to support her dispute.

118.    Plaintiff specifically disputed the grossly inaccurate and derogatory criminal record information.

119.    Plaintiff specifically stated that these criminal records do not belong to Plaintiff.

120.    Plaintiff further informed Defendant that she is a licensed gun owner in two states, a court process server, and a licensed real estate agent, emphasizing the havoc this inaccurate and derogatory report could wreak on her career, credentials, and personal life.

121.    Plaintiff specifically asked Defendant to investigate and delete these inaccurate and derogatory criminal records from any consumer report about Plaintiff.

122.    The next day on May 14, 2024, after not hearing back from Defendant, Plaintiff again informed Defendant as to the grossly inaccurate criminal records reported, how badly she can be further damaged by the publication of this information, and even provided the background check report provided by a local judge evidencing that she has no criminal convictions or charges, especially not the ones Defendant inaccurately reported about her.

123.    Plaintiff again requested that all such inaccurate and derogatory information be corrected.

**Defendant Failed to Conduct a Reasonable Reinvestigation and Correct the Consumer Report**

124.    Upon information and belief, as of June 14, 2024, Plaintiff received notice that Defendant failed to correct all of the inaccurate and derogatory information reported about Plaintiff.

125.    Defendant further failed to issue a corrected consumer report to the Plaintiff, her employer, or even to the unauthorized third-party user.

126.    Despite Plaintiff's dispute, Defendant failed to conduct a reasonable reinvestigation of Plaintiff's May 13, 2024, dispute and failed to delete the disputed information in violation of 15 U.S.C. § 1681i(a)(1)(A).

127.    But for Defendant's inaccurate consumer report, Plaintiff would not initially have lost her job or joint business venture, and Plaintiff would have been spared the humiliation,

embarrassment, stress, and relationship turmoil imposed upon Plaintiff to correct Defendant's erroneous reporting.

128.    Defendant's false report temporarily cost Plaintiff a promising, well-paying job with Morningstar, shut down all joint venture business engagements, and even compromised her relationship, in addition to imposing a great deal of humiliation, stress, anxiety, worry, and depression upon Plaintiff which resulted in the manifestation of physical symptoms.

129.    Due to Defendant's unreasonable procedures and shoddy, if any, dispute reinvestigation, and despite Plaintiff's continued efforts to seek employment, Plaintiff was unemployed for approximately eight ("8") weeks, something that she is still working to recover from.

130.    Specifically, Plaintiff could not manage to secure another employment, and out of desperation for some means of survival Plaintiff accepted unemployment assistance for approximately eight ("8") weeks until she went back to work on July 3, 2024.

131.    However, despite that fact that Plaintiff returned to her workplace, Morningstar's store manager did not want to hire Plaintiff back as the manager and other employees of Morningstar had informed the owner of the store that they were "terrified" of Plaintiff. Plaintiff was scorned by her co-workers, embarrassed before her church and pastor, and denigrated before her small community.

132.    The injuries suffered by Plaintiff as a direct result of Defendant's erroneous reporting are the type of injuries that the FCRA was enacted to address.  Under common law, Defendant's conduct would have given rise to causes of action based on intentional infliction of emotion distress, negligent infliction of emotional distress, negligence, and defamation.

133.     As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and benefits; loss of economic opportunities and positions and advancements in the future; loss of time and money trying to correct her background check report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; widespread damage to her reputation in her workplace, church, and community; loss of sleep; lasting psychological damage; a complete loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, depression, and embarrassment.

## CLAIMS FOR RELIEF
### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy

134.     Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

135.     Defendant is a "consumer reporting agency" as defined by 15 U.S.C. § 1681a(f).

136.     At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

137.     At all times pertinent hereto, the above-mentioned consumer report was a "consumer report" as that term is defined by 15 U.S.C. § 1681a(d).

138.     Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to "follow reasonable procedures to assure maximum possible accuracy" in the preparation of the consumer report it sold about Plaintiff as well as the information it published within the same.

139.     As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and

benefits; loss of economic opportunities and positions and advancements in the future; loss of time and money trying to correct her background check report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to her reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

140.    Defendant willfully violated 15 U.S.C. § 1681e(b) in that its conduct, actions, and inactions were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

141.    Plaintiff is entitled to recover statutory damages, punitive damages, and reasonable attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation**

142.    Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

143.    The FCRA mandates that a CRA conducts an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer.  *See* 15 U.S.C. § 1681i(a)(1).  The Act imposed a 30-day time limit for the completion of such an investigation.  *Id*.

144.    The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the

accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

145.     On at least one occasion during 2024, Plaintiff disputed the inaccurate information with Defendant and requested that Defendant correct and/or delete the inaccurate information in the consumer report that is patently inaccurate, misleading, and highly damaging to her, namely, stating that she is a convicted felon and misdemeanant, in addition to the fact that she was charged with numerous other misdemeanors and found guilty of numerous other violations and infractions.

146.     In response to Plaintiff's dispute, Defendant failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in the consumer report and refused and/or failed to correct the consumer report at issue.

147.     Defendant violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate; by failing to delete the disputed and inaccurate information from the subject consumer report; by failing to follow reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file; and by relying upon verification from a public source it has reason to know is unreliable.

148.     As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and benefits; loss of economic opportunities and positions and advancements in the future; loss of time and money trying to correct her background check report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to her reputation; loss of sleep;

lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, depression and embarrassment.

149. Defendant willfully violated 15 U.S.C. § 1681i in that its conduct, actions, and inactions were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

150. Plaintiff is entitled to recover statutory damages, punitive damages, and reasonable attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT III
### 15 U.S.C. § 1681b(a)
### Furnishing a Credit Report Without a Permissible Purpose

151. Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

152. This action involves the willful, knowing, and/or negligent violation of the FCRA relating to the dissemination of consumer credit and other financial information.

153. Plaintiff is a "consumer" as defined by the FCRA.

154. Defendant is a consumer reporting agency that furnishes consumer reports as defined and contemplated by the FCRA.

155. The FCRA prohibits any consumer reporting agency from furnishing a consumer report unless it has a permissible purpose enumerated under the FCRA, 15 U.S.C. § 1681b(a).

156. Defendant furnished Plaintiff's credit report to an unauthorized third party without a permissible purpose as Plaintiff initiated absolutely no business transaction, nor was such a

consumer report retrieved to review an account to determine whether the consumer continues to meet the terms of the account. There was additionally no applicable nor authorized the request for her consumer report, and which Defendant therefore had no reason to believe related to a business transaction involving Plaintiff or was otherwise authorized by Plaintiff, in violation of 15 U.S.C. § 1681b(a).

157.    Defendant violated 15 U.S.C. § 1681b(a) by selling Plaintiff's credit report to third parties who lacked a any permissible purpose delineated in 15 U.S.C. § 1681b(a).

158.    As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of her right to keep her private background information confidential; the loss of her right to information about who was viewing or requesting her background information; loss of employment opportunities, wages, and benefits; loss of economic opportunities and positions and advancements in the future; loss of time and money trying to correct her background check report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to her reputation; loss of sleep; lasting psychological damage from the widespread dissemination of this damaging information to her employer and spouse, church and pastor, and small community; loss of capacity for enjoyment of life through the judgement and shame Plaintiff was subjected to as a result of the false criminal record, leaving her isolated from her community and unable to participate in social and personal activities without feeling stigmatized; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, depression and embarrassment.

159.    Defendant's conduct, actions, and inactions was willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court

pursuant to 15 U.S.C. § 1681n.  Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

160.   Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT IV
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (in the alternative)

161.   Plaintiff relies on the factual allegations set forth in this Complaint, which form the basis for the relief requested for the Defendants' intentional infliction of emotional distress at common law. As such, Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

162.   In Virginia, to establish intentional infliction of emotional distress, Plaintiff must demonstrate the following four elements: (1) the wrongdoer's conduct was intentional or reckless; (2) the conduct was outrageous and intolerable in that it offends against the generally accepted standards of decency and morality; (3) there was a causal connection between the wrongdoer's conduct and the emotional distress, (4) the emotional distress was severe. *Edwards v. Arlington Hosp. Ass'n*, 23 Va. Cir. 396, 397 (Cir. Ct. 1991) (citing *Womack v. Eldridge*, 215 Va. 338, 342, 210 S.E.2d 145 (1974)).

163.   Regarding the first element of the wrongdoer's conduct being intentional or reckless, this element is satisfied either (i) where the wrongdoer had the specific purpose of inflicting emotional distress or (ii) where he intended his specific conduct and knew or should have known that emotional distress would likely result. *Zarate v. People for the Ethical Treatment of Animals*, 93 Va. Cir. 430, 439-40 (Cir. Ct. 2016) (citing *Womack*, 215 Va. 338, 210 S.E.2d at 148).

164.     Regarding the second means of satisfying the first element—where the wrongdoer intended their specific conduct and knew or should have known that emotional distress would likely result—Defendant's actions clearly meet this threshold.

165.     Defendant intentionally disseminated a background check report concerning Plaintiff to a third party, despite being on notice of the report's inaccuracies, given that Plaintiff's public records are devoid of any such criminal charges or convictions as made readily evident through the background check report retrieved from the local judge on May 13, 2024. The act of publishing patently false and highly derogatory information regarding criminal activity, especially to a party whom Defendant had no reason to think had a non-injurious intent (towards Plaintiff) to collect such information about Plaintiff, foreseeably threatened Plaintiff's employment, severely tarnished her reputation in her small community, church, and workplace, and endangered her personal relationships cultivated.

166.     Given the disaster such a false report almost certainly could have caused Plaintiff, such a publication would certainly impact Plaintiff's mental state, causing significant anxiety, distress, and emotional turmoil due to the profound personal, professional, and other harm inflicted. Given the egregiously damaging implications, Defendant either knew or, at the very least, should have known and realized that such conduct would likely lead to severe emotional distress, including anxiety, depression, panic, debilitating fear, and a deep disturbance to Plaintiff's psychological well-being—as it had actually occurred.

167.     This conduct was clearly outrageous, intolerable, and an affront to generally accepted standards of decency and morality, as no civilized society would consider it decent or

moral to issue such devastating and damaging reports without exercising the highest diligence and regard for accuracy.

168.    In any society grounded in basic respect for individuals, there is an expectation that entities with the power to influence lives through information, especially information with such far-reaching consequences, exercise a duty of care and truthfulness. The reckless issuance of a report falsely branding an individual with serious criminal charges fundamentally violates these expectations, as it disregards the severe harm inflicted upon an individual's personal reputation, professional stability, and emotional and physical well-being.

169.    Such conduct reflects a complete departure from principles of decency and tolerability which is exemplified through fairness and accountability, as it places innocent individuals at risk of total ruin—as it had happened with Plaintiff—without cause, care, or responsibility. Civilized society operates on a foundation of trust and reliability, particularly with entities entrusted to provide accurate information. Any breach of this standard is intolerable as it threatens the basic fabric of fairness and compassion which underpins civilized society.

170.    The causal connection between Defendant's conduct and Plaintiff's emotional distress is clear: Defendant's reckless dissemination of a false criminal record directly led to Plaintiff's severe anxiety, distress, and turmoil. This inaccurate report caused her to lose employment, strained her relationships, and placed her reputation and professional licenses in jeopardy, resulting in profound emotional suffering.

171.    As such, the publication of the report was a necessary condition of the severe emotional distress suffered because the emotional distress would not have occurred but for the report which had the pronounced propensity to ruin all aspects of Plaintiff's life.

172.    Additionally, it was the proximate cause of Plaintiff's emotional suffering, as the report's false portrayal of her as a criminal tarnished her character and credibility, causing irreparable damage to her personal relationships and professional standing. Such widespread harm was not only foreseeable but certain, given the destructive consequences that inevitably arise from labeling an innocent person with a fabricated criminal past. The distress Plaintiff experienced was directly attributable to the report, as it led to immediate and extensive ruin in both her personal and professional spheres.

173.    Plaintiff suffered profound and multifaceted emotional distress due to Defendant's actions, which impacted nearly every aspect of her personal and professional life. Upon learning that a grossly inaccurate report falsely depicted her as a convicted felon, Plaintiff, in her late sixties, experienced intense anxiety and fear over the consequences. This distress was compounded by the immediate fallout: she abruptly lost her job, her spouse believed she had hidden a criminal past, leading to the breakdown of their relationship, and her planned business venture was canceled. Additionally, her coworkers, informed of these false criminal allegations, viewed her as a "terrifying" criminal, which deeply wounded her reputation, eroded workplace trust, and left her feeling isolated, shamed, and humiliated.

174.    Plaintiff's severe distress was heightened by the struggle to make basic expense payments without her income, compounded by panic over how she would find new employment at her age, sustain herself financially, or live in a dignified manner. She faced ongoing anxiety attacks over the far-reaching repercussions of being mischaracterized as a criminal, including the potential loss of her real estate license and gun permits, which are essential to her livelihood and sense of security.

175. The reputational harm and humiliation inflicted by this false information led to panic attacks, insomnia, depression, lack of appetite, nausea, and a complete diminishing of Plaintiff's enjoyment of life. This enduring distress reflects the severe and ongoing impact on her security, identity, and mental well-being caused by Defendant's actions—the emotional and mental distress that no reasonable person could be expected to endure.

**COUNT V**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (in the alternative)**

176. Plaintiff relies on the factual allegations set forth in this Complaint, which form the basis for the relief requested for the Defendants' negligence at common law. As such, Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

177. "A cause of action for negligence consists of four elements: (1) a duty the defendant owes to the plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) an injury." *AG4 Holding, LLC v. Regency Title & Escrow Servs.*, 98 Va. Cir. 89, 102 (Cir. Ct. 2018) (citing *Richardson v. Lovvorn*, 199 Va. 688, 692, (1958)).

178. In regard to claims of negligence, the factual allegations must establish the existence of a duty of care. *Frazier v. Strobel*, 58 Va. Cir. 456, 457 (Cir. Ct. 2002) (citing *Yuzefovsky v. St. John's Wood Apartments, et al.*, 261 Va. 97, 540 S.E.2d 134 (2001)).

179. Virginia law has embraced the common-law principle of assumption of duty, namely that one who assumes to act, even if gratuitously, may thereby become subject to the duty of acting carefully if he acts at all. *Lott v. Wheeler*, 107 Va. Cir. 236, 238 (Cir. Ct. 2021) (citing *Kellermann v. McDonough*, 278 Va. 478, 489, 684 S.E.2d 786 (2009)).

180.    In the case at hand, Defendant undertook—for monetary consideration—to provide a background check report about Plaintiff, which had the potential to, and in fact did, wreak havoc on Plaintiff's personal and professional life through its false contents.

181.    Specifically, this duty was especially present and undertaken given Plaintiff's vulnerable position relative to Defendant's reporting. Plaintiff's continued employment (which was terminated as a direct result of the report), her relationships (which fell apart because of the false allegations), and her professional licensures (which were jeopardized by the inaccurate report) were all dependent on Defendant accurately reporting her criminal records—of which she had none. By assuming the responsibility to provide this report, Defendant accepted a duty to act with care by accurately reporting such contents, clearly aware of the profound personal and professional consequences Plaintiff could face from any inaccuracy.

182.    Defendant was clearly derelict in its duties since it failed to exercise reasonable care in verifying the accuracy of Plaintiff's background check. By neglecting to review widely available public records and by recklessly attributing serious criminal charges to Plaintiff without proper verification, Defendant disregarded the duty it undertook to report accurate information about Plaintiff to avoid causing the upheaval of her personal and professional life.

183.    Defendant's breach of its duty to provide accurate information—through its negligent reporting of false criminal charges against Plaintiff—was both the but-for and proximate cause of the damages she suffered. Namely, but for Defendant's failure to verify the accuracy of its report and actual provision of these grossly inaccurate and derogatory criminal records, Plaintiff would not have faced the loss of her employment, the breakdown of her personal relationships, or the threat to her professional licensures.

184.    Furthermore, this inaccurate reporting set in motion a natural and foreseeable chain of events that directly led to Plaintiff's significant personal, professional, and financial harms, establishing Defendant's conduct as the proximate cause of Plaintiff's losses and distress.

185.    Specifically reports containing serious inaccuracies—especially those falsely indicating an egregious criminal history—have a strong and well-documented tendency to cause severe consequences, including job loss, relationship breakdown, and emotional distress. Employers, regularly encountering background checks that are indicative of the character, fittingness, reliability, and lifestyle of their employees, are likely to reject or terminate individuals portrayed as having an egregious criminal past, as is evidently demonstrable through Fair Credit Reporting Act cases pertaining to inaccurate background check reports supplied to employers regarding their employees.

186.    Additionally, such erroneous reports damage personal relationships, as they create doubt, mistrust, and a sense of betrayal among close friends and family members who may feel deceived about the individual's character. Emotionally, the stigma and isolation resulting from such damaging accusations predictably lead to intense distress, anxiety, and depression as the affected individual grapples with the social, professional, and financial fallout. Thus, Defendant's failure to accurately report Plaintiff's information directly and foreseeably led to these harms, making its conduct the proximate cause of Plaintiff's profound losses.

187.    As a direct result of Defendant's negligent reporting, Plaintiff suffered a range of significant emotional, physical, and financial damages that disrupted nearly every aspect of her life. Emotionally, she endured severe anxiety, depression, and persistent worry about her future, stemming from the sudden loss of employment, the strain on her personal relationships, and the

tarnishing of her reputation. Her relationship with her spouse, believing she had concealed a criminal history, deteriorated irreparably, leading to isolation and intense feelings of betrayal. Professionally, Plaintiff's credibility and trustworthiness were unjustly called into question, resulting in the abrupt cancellation of a joint business venture and her immediate termination from employment. She also faced the risk of losing her hard-earned licenses, including real estate and gun permits, which are critical to her livelihood and personal identity. Physically, the relentless stress caused insomnia, panic attacks, loss of appetite, and a decline in her overall health, robbing her of the capacity to enjoy life. Financially, Plaintiff was left struggling to cover basic expenses without her income, facing the added stress of finding new employment in her late sixties while being unfairly stigmatized as a criminal. Each of these injuries reflects a specific harm that compounded Plaintiff's distress, leading to enduring psychological trauma and a profound disruption of her personal and professional life.

### COUNT VI
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (in the alternative)

188.    Plaintiff relies on the factual allegations set forth in this Complaint, which form the basis for the relief requested for the Defendants' negligent infliction of emotional distress at common law. As such, Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

189.    The Virginia Supreme Court in *Hughes v. Moore*, 214 Va. 27, 34, (1973) held that mental anguish not caused by a direct physical injury will be recognized as a separate action if the Plaintiff can prove the following  elements: (1) the defendant was negligent; (2) such negligence was the direct and proximate cause of emotional distress; and (3) the emotional distress naturally resulted in a physical injury; that is, a claim for negligent infliction of emotional distress is one

where a plaintiff was not physically injured but experienced such emotional fright or shock that the emotional disturbance manifested itself in the form of physical injury. *Beach v. McKenney*, 82 Va. Cir. 436, 440 (Cir. Ct. 2011) (citing *Hughes*, 214 Va. at 34).

190.    The first two elements of negligence through the established duty of care and breach of this duty and proximate causation of this breach to the harms suffered by Defendant were addressed in the negligence cause of action assessment above. The only element left to discuss is therefore that of the emotional distress naturally resulting in physical injury.

191.    Plaintiff's emotional distress, stemming from Defendant's negligent and inaccurate reporting, was profound and overwhelming. The distress from losing her job, the breakdown of her relationship, and the widespread damage to her personal and professional reputation led to a state of persistent anxiety and deep depression. Plaintiff's emotional state deteriorated to the point of experiencing severe physical manifestations unrelated to mere emotional discomfort.

192.    Her distress resulted in frequent panic attacks, characterized by heart palpitations, chest pain, shortness of breath, and a sensation of physical pressure, which left her incapacitated and fearful for her health. She also suffered from chronic insomnia due to the relentless worry over her financial and professional future, significantly disrupting her sleep patterns and leading to daily fatigue and exhaustion. This sleep deprivation further weakened her immune system, leaving her vulnerable to illness—which she suffered from.

193.    Additionally, Plaintiff experienced digestive issues, including nausea, loss of appetite, and persistent stomach pain, which resulted in unintended weight loss and malnutrition, impacting her overall physical health. Each of these physical injuries is a direct manifestation of the intense emotional strain placed on Plaintiff by Defendant's grossly inaccurate and derogatory

criminal reporting of her, reflecting the severe impact on her physical well-being beyond emotional

or psychological harm alone.

## COUNT VII
## DEFAMATION PER SE (in the alternative)

194.    Plaintiff relies on the factual allegations set forth in this Complaint, which form the

basis for the relief requested for the Defendants' defamation at common law. As such, Plaintiff re-

alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully

stated herein.

195.    Under Virginia law, to state a claim for defamation, plaintiff must show (1)

publication; (2) of an actionable statement, with (3) the requisite intent. *Echtenkamp v. Loudon*

*Cty. Pub. Schs*, 263 F. Supp. 2d 1043, 1061 (E.D. Va. 2003) (citing  *Chapin v. Knight-Ridder,*

*Inc.,* 993 F.2d 1087, 1092 (4th Cir. 1993)).

196.    To be an actionable statement, the statement must not only be false but must also

be defamatory—which means that it must "tend so to harm the reputation of another as to lower

him in the estimation of the community or to deter third persons from associating or dealing with

him." *Id*. In other words, the false statements must make the plaintiff appear "odious, infamous,

or ridiculous." *Id*.

197.    A statement is even deemed to be defamatory per se if it either "(i) imputes the

commission of a crime of moral turpitude for which a party may be convicted, (ii) imputes that the

person is infected with a contagious disease which would exclude the person from society, (iii)

imputes an unfitness to perform the duties of a job or lack of integrity in the performance of duties,

or (iv) prejudices the party in her profession or trade." *Echtenkamp*, 263 F. Supp. 2d at 1061 (citing

*Yeagle v. Collegiate Times,* 255 Va. 293, 297 n.2, (1998)).

198.    In the case at hand, the statements imputing criminal convictions to Plaintiff undoubtedly constitute actionable statements, as they are both false and deeply damaging to her reputation.

199.    In the eyes of ordinary people, allegations of serious crimes such as felony convictions and repeated misdemeanors evoke distrust, suspicion, and a perception of untrustworthiness. Such accusations naturally lead others to question Plaintiff's integrity, deterring individuals from associating or dealing with her.

200.    These false statements led directly to tangible harm: Plaintiff's relationship ended as her partner believed she had concealed her criminal past, her employment was terminated due to these allegations, and her planned business venture was abruptly canceled. Furthermore, the defamatory nature of these statements caused her coworkers to view her with suspicion, isolating her and eroding trust within her professional environment.

201.    However, the defamatory impact of these statements goes beyond their general harmful nature, as they meet the standard for defamation *per se* under Virginia law.

202.    Statements that impute crimes of moral turpitude—such as embezzlement or obtaining money by false pretenses—constitute defamation *per se*, meaning they are considered essentially defamatory without the need for additional proof of reputational damage. *See Schnupp v. Smith*, 249 Va. 353, 457 S.E.2d 42 (1995) (citing *Great Coastal Express, Inc. v. Ellington*, 230 Va. 142, 146, 334 S.E.2d 846, 850 (1985)) ("As the opinion in Great Coastal indicates, words that impute the commission of a crime which is "punishable by imprisonment in a state or federal institution" are also actionable per se.")

203.    Additionally, because these statements prejudiced Plaintiff in her employment, leading to her termination, and foreclosed a prospective business venture, they satisfy multiple categories of defamation per se.

204.    Thus, even without considering the specific facts of this case that highlight the harm Plaintiff suffered, the false criminal accusations published about her are inherently actionable under defamation per se principles, and Defendant is liable for the ensuing damage to Plaintiff's reputation, livelihood, and personal relationships.

205.    These actionable statements were undoubtedly published and disseminated by Defendant to a third party who himself had absolutely no employment relationship to Plaintiff, nor any other relationship that would have evinced privilege protections.

206.    Regarding the final element of requisite intent, the Virginia Supreme Court has defined necessary intent to be malice, which requires that actual malice be present in such publications which requires "clear and convincing proof of knowledge of falsity or reckless disregard for the truth." *Adams v. Children's Hosp. of the King's Daughters*, 100 Va. Cir. 68, 74 (Cir. Ct. 2018) (citing  *Gazette v. Harris*, 229 Va. 1, 13, (1985)).

207.    The United States Supreme Court noted regarding this element that:

"…reckless disregard for the truth … requires more than a departure from reasonably prudent conduct. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication …. [and] that the defendant actually had a high degree of awareness of probable falsity."

*Jordan v. Kollman*, 269 Va. 569, (2005) (citing *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 688, 105 L. Ed. 2d 562, 109 S. Ct. 2678 (1989); *Shenandoah Publ'g House, Inc. v. Gunter*, 245 Va. 320, 324, (1993).

208.    Defendant possessed a high degree of awareness of the probable falsity of the report it issued about Plaintiff.

209.    In compiling Plaintiff's background check, Defendant would have encountered multiple indicators within public records despite similar names, like distinctive birth dates, social security numbers, and address information—that clearly distinguished Plaintiff from the individuals with criminal histories.

210.    Given these likely discrepancies, Defendant had strong reason to question and doubt that the criminal records applied to Plaintiff specifically. As a reporting agency with access to these records, Defendant would have understood the significance of these details in accurately identifying individuals and associating criminal records therewith. The presence of these multiple red flags should have and likely did raise serious doubts regarding the truth of the report—given Defendant's experience and knowledge as a reporting agency and understanding of what can qualify a report as true or false of a specific individual, leading to the conclusion that Defendant understood the high degree of falsity of the report but still decided to proceed with this knowledge to its criminal record publication about Plaintiff to a third party.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for the following relief:

i.    Determining that Defendant negligently and/or willfully violated the FCRA;

ii.    Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii.    Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv.    Granting further relief, in law or equity, as this Court may deem appropriate and just.

v.     In the alternative, if this Court determines that the FCRA is inapplicable to the

circumstances at hand, Plaintiff requests compensatory damages, punitive damages, and

such other relief as the Court may deem appropriate to compensate for the full extent of

harm caused by Defendant's conduct in its common law tort violations as against Plaintiff.

## **DEMAND FOR JURY TRIAL**

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

**Karen Marie Foster,**

<u>/s/Susan Mary Rotkis</u>
Susan Mary Rotkis,
VSB 40693
Consumer Justice Law Firm PLC
2290 East Speedway Blvd.
Tucson, AZ 85719
T: 602-807-1504
F: 718-715-1750
E: srotkis@consumerjustice.com

*Attorneys for Plaintiff,*
*Karen Marie Foster*